*Albert F. Oliveira, et al. v. Jay Sugarman, et al.*, No. 17, September Term, 2016, Opinion by Adkins, J.

**CORPORATIONS — DERIVATIVE LAWSUITS — BUSINESS JUDGMENT RULE:** The modified business judgment rule established by *Boland v. Boland*, 223 Md. 296 (2011), does not apply to a disinterested and independent board of directors' decision to deny a shareholder litigation demand. The *Boland* standard only applies when a board of directors that is not majority disinterested and independent chooses to utilize a special litigation committee to respond to such a demand. When a board consisting of a majority of disinterested and independent directors does not delegate its decision-making power to a special litigation committee, the traditional business judgment rule applies.

**CORPORATIONS — SHAREHOLDER DIRECT LAWSUIT AGAINST CORPORATE DIRECTORS — BREACH OF CONTRACT:** When a board of directors modifies a shareholder-approved equity compensation plan to allow for compensation despite the failure to meet established performance goals, it does not give rise to a direct shareholder claim for breach of contract. To constitute a contract, the equity compensation plan must include a clear offer and acceptance, as well as language indicating an intent for both parties to be bound.

**CORPORATIONS — SHAREHOLDER DIRECT LAWSUIT AGAINST CORPORATE DIRECTORS — PROMISSORY ESTOPPEL:** Although statements within a shareholder proxy statement may be sufficient to give rise to a direct claim for promissory estoppel, to make out such a claim shareholders must allege that they suffered an injustice distinct from any injury to the corporation that can only be remedied by the enforcement of the promise. Here, shareholders failed to allege such an injustice.

Circuit Court for Baltimore City
Case No.: 24-C-14-001243
Argued: October 7, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 17

September Term, 2016

ALBERT F. OLIVEIRA, et al.

v.

JAY SUGARMAN, et al.

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

Opinion by Adkins, J.

Filed: January 20, 2017

Petitioners Albert F. Oliveira and Lena M. Oliveira filed suit against current and former members of iStar's Board of Directors and senior management in the Circuit Court for Baltimore City for breach of fiduciary duty, unjust enrichment, waste of corporate assets, breach of contract, and promissory estoppel arising from the Board of Directors' modification of performance-based executive compensation awards, which were granted in the form of stock. The Circuit Court dismissed all of Petitioners' claims for failure to state a claim, and the Court of Special Appeals affirmed. We hold that the traditional business judgment rule applies to a board of directors' decision to deny a shareholder litigation demand, not the heightened standard established by *Boland v. Boland*, 223 Md. 296 (2011). Furthermore, we hold that Petitioners do not allege facts sufficient to support direct claims for breach of contract or promissory estoppel. Thus, they are derivative claims that are subject to the business judgment rule. They were correctly dismissed.

## FACTS AND LEGAL PROCEEDINGS

Petitioners are Albert F. Oliveira and Lena M. Oliveira, trustees for the Oliveira Family Trust, a shareholder of iStar Financial Inc. ("iStar"). iStar is a publicly traded real estate investment trust incorporated in Maryland with its principal place of business in New York. Respondents are iStar and current and former members of iStar's Board of Directors.[1]

---

[1] Management Respondents are Jay Sugarman, Nina B. Matis, R. Michael Dorsch III, Michelle M. MacKay, Barbara Rubin, and David DiStaso. They were each recipients of the disputed executive compensation awards. Jay Sugarman is the Chairman and Chief Executive Officer of iStar and currently serves on iStar's Board of Directors. Director Respondents are Glen August, Robert W. Holman, Jr., Robin Josephs, John G. McDonald, George R. Puskar, Dale Anne Reiss, Barry W. Ridings, and Jeffrey A. Weber. iStar is also

## The 2008 Awards and 2009 Plan

On December 19, 2008, iStar's Board of Directors ("the Board") granted over ten million performance-based restricted stock units to certain iStar executives and employees ("the 2008 Awards"). The Board intended for the awards to vest only if iStar common stock achieved any of the following average closing prices over a period of 20 consecutive days: $4.00 or more prior to December 19, 2009; $7.00 or more prior to December 19, 2010; or $10.00 or more prior to December 19, 2011. When the Board granted these awards, iStar did not have enough authorized shares of stock to pay the awards if they vested. Thus, in 2009, the Board sought shareholder approval of an issuance of additional stock units to be used for executive compensation.

On April 23, 2009, Chief Executive Officer ("CEO") Jay Sugarman sent a letter inviting iStar shareholders to the annual shareholders meeting. The letter indicated that at the meeting shareholders would be asked to "consider and vote upon a proposal to approve the iStar Financial Inc. 2009 Long-Term Incentive Plan" ("the 2009 Plan"). The mailing also included a notice of the annual shareholders' meeting, which explained that shareholders were to "consider and vote" on the 2009 Plan at the meeting. The notice indicated that the 2009 Plan was "further described in the accompanying proxy statement." Moreover, the Board included a letter introducing the proxy statement, which urged shareholders to approve the 2009 Plan. The letter told shareholders, "[I]t is crucial that we

_____

a Respondent. It filed a brief with Director Respondents, which Management Respondents joined. iStar and Director Respondents joined in Management Respondents' brief. Therefore, for the sake of brevity, we will refer to all of them as "Respondents."

retain and motivate our senior leaders and key employees by granting long-term, performance-based equity incentive compensation." It continued, "In particular, if the 2009 Plan is not approved, we are obligated to settle existing performance-based awards granted on December 19, 2008 in cash, rather than common stock, if the performance and vesting conditions of those awards are achieved."

The attached Schedule 14A Proxy Statement ("the 2009 Proxy Statement") further described the 2009 Plan, which authorized the issuance of an additional eight million shares of common stock. The Proxy Statement explained that "the ongoing financial crisis and its negative impact on [iStar] business and financial results" had led to a depletion of iStar shares issued in 2006. This new stock would allow iStar to settle the 2008 Awards—if they vested—with stock rather than cash, which would enable the corporation to preserve cash. The Proxy Statement also noted that approval of the 2009 Plan would "ensure, for federal tax purposes, the deductibility of compensation recognized by certain participants in the 2009 Plan which may otherwise be limited by Section 162(m) of the Internal Revenue Code." A copy of the 2009 Plan was attached to the Proxy Statement.

On April 27, 2009, Respondents filed the Proxy Statement with the United States Securities and Exchange Commission. On May 27, 2009, at the annual shareholders' meeting, the shareholders voted to approve the 2009 Plan.

In 2009, iStar did not meet its target share price for 20 consecutive days as required for the 2008 Awards to vest. In 2010, iStar achieved the target price of $7.00 for 20 consecutive days ending on December 20—eight trading days too late to vest the 2008 Awards. Following this near miss, iStar began considering modification of the 2008

3

Awards "to achieve a fair balance between rewarding management's exceptional performance, as reflected by the 300% rise in the market value of iStar stock, and enforcing the terms of the 2008 Awards." After several Board and Compensation Committee meetings, as well as discussion with legal, accounting, and compensation advisors, the Board modified the 2008 Awards to convert them from performance-based to service-based awards (the "2011 Modification").

Under the 2011 Modification, iStar executives received compensation in three installments—on January 1, 2012, 2013, and 2014—as long as the employee still worked for iStar on the vesting date. The 2011 Modification also reduced the amount of the 2008 Awards by 25 percent. With the 2011 Modification, the Board hoped to prevent key members of iStar management from leaving the corporation. Additionally, the Board believed that modifying the existing 2008 Awards, which had already been largely expensed, would be more cost effective than issuing new awards.

### Demand and Response

On May 23, 2013, Petitioners demanded that the Board "investigate and institute claims on behalf of [iStar] . . . against responsible persons" related to the 2011 Modification. Petitioners demanded that the Board rescind all shares of stock issued under the 2009 Plan to settle the 2008 Awards, or, alternatively, "seek any other appropriate relief on behalf of [iStar] for damages sustained . . . as a result of the Board's misconduct" in modifying the 2008 Awards. Additionally, Petitioners sought to "[e]njoin [iStar] from issuing any more shares under the 2009 Plan to settle the 2008 Awards."

4

In June 2013, the Board appointed Barry W. Ridings, an outside, non-management director who joined the Board after the 2011 Modification, to serve as the demand response committee ("the Committee"). The Committee was tasked with investigating Petitioners' demand and making a recommendation to the Board as to the best course of action. The Committee hired outside counsel, Joseph S. Allerhand and Stephen A. Radin of Weil, Gotshal & Manges LLP, to assist with the investigation. In October 2013, following extensive document review and interviews with key iStar executives, the Committee recommended that the Board refuse Petitioners' demand. On November 11, 2013, the Board unanimously voted in accordance with that recommendation.

In a letter sent to Petitioners on November 12, 2013, the Board presented several reasons for denying their demand. The Board noted that the Committee had concluded that the Board made a good faith, informed business judgment to modify the 2008 Awards, and that it had the authority to do so. Additionally, the Board explained that if it were to rescind the 2008 Awards, it would harm corporate morale and likely invite litigation from management executives. Lastly, the Board noted that even if it were to win the demanded litigation, the damages would not be enough to offset the cost of issuing new awards. The Board concluded that it saw "no upside—and much downside—to the action and lawsuit proposed in the [d]emand. iStar would probably lose, suffer substantial harm, and pay both sides' attorneys' fees."

**Legal Proceedings**

On March 10, 2014, Petitioners filed a complaint in the Circuit Court for Baltimore City. They brought five claims against Respondents: (1) breach of fiduciary duty;

(2) unjust enrichment; (3) waste of corporate assets; (4) breach of contract; and (5) promissory estoppel. The first three counts were alleged derivatively, and the last two were brought directly. In their motion to dismiss, Respondents argued that all of Petitioners' claims were derivative, and they had failed to plead facts sufficient to overcome the presumption that the Board had acted with sound business judgment. Following a hearing, the Circuit Court dismissed all of Petitioners' claims.

Petitioners filed a timely appeal to the Court of Special Appeals. In a reported decision, the Court of Special Appeals affirmed the grant of the motion to dismiss. *Oliveira v. Sugarman*, 226 Md. App. 524 (2014). It held that the Circuit Court correctly applied the business judgment rule to the Board's decision to deny Petitioners' litigation demand, and that Petitioners failed to allege facts overcoming the business judgment rule presumption. *Id.* at 540, 543. It viewed Petitioners' breach of contract and promissory estoppel claims as derivative claims that could not be asserted directly. *Id.* at 552.

We granted *certiorari* to answer the following questions: [2]

---

[2] We have rephrased the questions presented for clarity. The Petition for Writ of Certiorari presented the following questions:

> 1. Is a board of directors entitled to the presumption of the business judgment rule contained in Md. Code Ann., Corps. & Ass'ns § 2-405.1 when responding to a shareholder demand without presenting evidence that the board acted independently, in good faith, and was reasonably informed as required by *Boland v. Boland*, 223 Md. 296 (2011)?
>
> 2. Can shareholders of a Maryland corporation bring direct claims against the board of directors for (a) misrepresentations made in a proxy statement soliciting

6

1. Does the modified business judgment rule established by *Boland v. Boland*, 223 Md. 296 (2011), apply to a disinterested and independent board of directors' decision to deny a shareholder litigation demand?

2. Have Petitioners alleged sufficient facts to support direct shareholder claims for breach of contract and promissory estoppel?

We answer no to both questions. Therefore, we shall affirm the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

Petitioners appeal from the Circuit Court's grant of a motion to dismiss. "We review the grant of a motion to dismiss as a question of law." *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 334 (2009) (citation omitted). Therefore, we analyze whether the granting of the motion was legally correct. *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643–44 (2010) (citations omitted). In doing so, we review the Circuit Court's decision without deference. *See State v. Johnson*, 367 Md. 418, 424 (2002). To determine whether dismissal was appropriate, we ask whether the facts alleged in the well-pleaded complaint, if taken as true, support a cause of action for which relief may be granted. *RRC Northeast, LLC*, 413 Md. at 644 (citation omitted). We construe all inferences in the light most favorable to the non-moving party, and order dismissal only if the allegations and permissible inferences, if true, still fail to afford the plaintiff relief. *Id.* at 643 (citation omitted).

---

shareholder votes and (b) for breaches of a shareholder-approved incentive stock plan?

7

## DISCUSSION

Petitioners argue that this Court should apply the modified business judgment rule established in *Boland v. Boland*, 423 Md. 296 (2011), to all instances where a corporate board denies a shareholder's demand to initiate a derivative suit. In applying this heightened scrutiny, they argue, the Court should hold that Respondents improperly denied their litigation demand as to their claims of breach of fiduciary duty, unjust enrichment, and waste of corporate assets. Additionally, Petitioners claim the right to proceed on their breach of contract and promissory estoppel counts because, as direct—not derivative—shareholder claims, they are not subject to the business judgment rule.[3]

Respondents, by contrast, urge this Court to review the Board's decision to deny Petitioners' litigation demand under the traditional business judgment rule and affirm the grant of the motion to dismiss. Regarding Petitioners' claims for breach of contract and promissory estoppel, Respondents say they are derivative claims that were properly dismissed for failure to state a claim overcoming the business judgment rule.

---

[3] Petitioners also argue that whether or not we apply enhanced *Boland* scrutiny to the Board's decision to deny Petitioners' litigation demand, we should not accept assertions made in a demand denial letter as true in determining whether to grant a motion to dismiss. They contend that the Court of Special Appeals erred in relying on *Scattered Corporation v. Chicago Stock Exchange, Inc.*, 701 A.2d 70, 76 n.24 (Del. 1997), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), to hold otherwise. But this question does not pertain to the two *certiorari* issues before us. The Circuit Court relied on the demand denial letter to determine whether the Board acted in accordance with the business judgment rule. Referring to information within the letter, the court found that Barry W. Ridings, who served as the Committee, was a disinterested director. Additionally, looking to the methodology described in the letter, the court concluded that the Committee's procedure neither "suggests impropriety" nor "raises concern." Here, Petitioners do not assert that the Board failed to act in accordance with the business judgment rule, only that we should apply enhanced scrutiny instead. Thus, this question is not before us.

## The Business Judgment Rule

Under the traditional business judgment rule, courts apply a presumption of disinterestedness, independence, and reasonable decision-making to all business decisions made by a corporate board of directors. The business judgment rule protects corporate directors from liability when the majority of directors act prudently and in good faith. *Boland*, 423 Md. at 328 (quoting *Devereux v. Berger*, 264 Md. 20, 31–32 (1971)). The Delaware Supreme Court described the rule as follows:

> It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by courts.

*Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) (citations omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).[4] To overcome the "dangerous terrain" of the business judgment rule presumption, the plaintiff must assert facts that suggest the corporate directors did not act in accordance with the rule. *Boland*, 423 Md. at 329 (quoting *Bender v. Schwartz*, 172 Md. App. 648, 666 (2007)). In other words, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption."[5] *Aronson*, 473 A.2d at 812.

---

[4] This Court frequently looks to Delaware courts for guidance on issues of corporate law. *See Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 338 n.14 (2009) ("This Court has noted the respect properly accorded Delaware decisions on corporate law ordinarily in our jurisprudence." (quoting *Werbowsky v. Collomb*, 362 Md. 581, 618 (2001) (internal quotation marks omitted))).

[5] When a shareholder successfully makes such a showing, courts generally apply the two-pronged "entire fairness standard" to evaluate the challenged business decision.

Maryland has codified the business judgment rule in Maryland Code (1976, 2014 Repl. Vol.), § 2-405.1 of the Corporations and Associations Article ("C & A"). Section 2-405.1(a) imposes a duty on a director to act "(1) [i]n good faith; (2) [i]n a manner he reasonably believes to be in the best interests of the corporation; and (3) [w]ith the care that an ordinarily prudent person in a like position would use under similar circumstances."[6] Under C & A § 2-405.1(e), "[a]n act of a director of a corporation is

<hr>

*Bender v. Schwartz*, 172 Md. App. 648, 670 (2007). The Delaware Supreme Court has explained the standard as follows:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the [business decision], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (citations omitted).

[6] Effective October 1, 2016, Maryland Code (1976, 2014 Repl. Vol.), § 2-405 of the Corporations and Associations Article ("C & A") was amended. Section 2-405.1(a) was renumbered as § 2-405.1(c) and rewritten in gender-neutral language. The amended statute provides:

> (c) *In general.* — A director of a corporation shall act:
> (1) In good faith;
> (2) In a manner the director reasonably believes to be in the best interests of the corporation; and
> (3) With the care that an ordinarily prudent person in a like position would use under similar circumstances.

10

presumed to satisfy the standards of subsection (a) of this section."[7] Maryland courts apply the business judgment rule to "all decisions regarding the corporation's management." *Shenker*, 411 Md. at 344 (citing *NAACP v. Golding*, 342 Md. 663, 673 (1996)).

To seek judicial review of a board's business decision under the business judgment rule, shareholders must file a derivative suit on behalf of the corporation. *Werbowsky v. Collomb*, 362 Md. 581, 599 (2001). The obligation of directors to perform their duties in accordance with good business judgment runs to the corporation, not directly to the shareholders. *Id.* Therefore, its breach gives rise to a legal right that belongs exclusively to the corporation. *Id.* By bringing a derivative action, shareholders invoke "an extraordinary equitable device . . . to enforce a corporate right that the corporation failed to assert on its own behalf." *Id.* In a derivative suit, "[t]he corporation is the real party in interest and the shareholder is only a nominal plaintiff. The substantive claim belongs to the corporation." *Id.* (quoting 13 William Meade Fletcher et al., Cyclopedia of the Law of Private Corporations § 5941.10 (1995 Rev. Vol.)).

Because a derivative lawsuit intrudes upon the board of directors' managerial control of the corporation, shareholders are required to first make a demand that the board take action before initiating a derivative suit. *Id.* at 600. In *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991), the Supreme Court explained that "[t]he purpose of the demand requirement is to afford the directors an opportunity to exercise their reasonable

---

[7] Section 2-405.1(e) was renumbered as § 2-405.1(g) and now reads: "An act of a director of a corporation is presumed to be in accordance with subsection (c) of this section."

11

business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Id.* at 96 (citation omitted) (internal quotation marks omitted). If the board of directors denies a litigation demand, the shareholder must overcome the presumption of the business judgment rule to continue the lawsuit. *Boland*, 423 Md. at 331. The corporate board's decision to deny the litigation demand receives the same business judgment rule presumption as any other board decision. *Id*. at 329–30.

Our decision in *Boland*, however, established an exception to the application of the business judgment rule to a board's decision to deny a shareholder litigation demand. When a board consisting of a majority **interested** directors utilizes **a special litigation committee** (an "SLC") to evaluate a litigation demand, courts apply a modified business judgment rule. Directors are considered to be interested if they either "appear on both sides of a transaction" or "expect to derive [ ] personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* at 329 (quoting *Werbowsky*, 362 Md. at 609). If a majority of a corporate board is interested in the challenged transaction, the board can appoint an SLC to decide whether it should accept or deny the litigation demand. Through the selection of the SLC's members, interested boards "can retain a voice in the derivative lawsuit despite the adverse interests of board members." *Id*. at 332. In *Boland*, we defined an SLC as a committee "composed of independent, disinterested directors, either inside the corporation or specially appointed from outside the corporation" and "vested with the authority to

12

render a corporate decision." *Id.* Unlike other demand response committees, an SLC does not make a recommendation to the board—it renders a decision itself.[8]

In *Boland*, a corporate board comprising of four brothers executed two stock transactions that substantially increased their ownership interest in the family business. *Boland*, 423 Md. at 313. The brothers' non-director siblings demanded the board pursue litigation for a breach of fiduciary duties, among other claims, and the board appointed an SLC to respond. *Id.* at 315, 319. The SLC denied the litigation demand, and the non-director siblings contested the decision. *Id.* at 321–23. We held that when an interested board—a board with a majority interested directors—forms an SLC to address a shareholder's litigation demand, the reviewing court does not presume the SLC acted with proper business judgment. Rather, the burden of proof is on the corporation to present evidence that the SLC acted independently, in good faith, and with reasonable procedures. We explained:

> [T]he court should not grant summary judgment on the basis
> of an SLC's decision unless the directors have stated how they

---

[8] We recognize that some courts—including this one—have used the term "special litigation committee" broadly to describe any committee appointed by a board to evaluate a litigation demand, regardless of whether it has the power to render a final decision or only give a recommendation. *See, e.g.*, *Werbowsky*, 362 Md. at 619 (demand requirement gives the board the option to "seek the advice" of a "special litigation committee"); *Seidl v. Am. Century Cos., Inc.*, 799 F.3d 983, 992–94 (8th Cir. 2015) (evaluating demand denial when board utilized a "special litigation committee" but retained full decision-making power). Others have used the term to refer specifically to committees with final say as to the litigation demand. *See, e.g.*, *Janssen v. Best & Flanagan*, 662 N.W.2d 876, 888 (Minn. 2003) (rejecting defendant's attempt to portray special counsel as a special litigation committee because "he acted more like a legal advisor than a neutral decision maker"). We adopt the definition set forth in *Boland*, 423 Md. at 332. As used in this opinion, "special litigation committee" refers only to a committee vested with full decision-making power to accept or deny the shareholder litigation demand.

13

> chose the SLC members and come forward with some evidence that the SLC followed reasonable procedures and that no substantial business or personal relationships impugned the SLC's independence and good faith.

*Id.* at 340–41. This "enhanced" scrutiny shifts the burden to prove the legitimacy of the SLC and its procedures from the shareholders to the corporate board. *Id.* at 349.

Our *Boland* SLC exception draws from two seminal decisions, one from New York, *Auerbach v. Bennett*, 393 N.E.2d 994 (N.Y. 1979), and one from Delaware, *Zapata Corporation v. Maldonado*, 430 A.2d 779 (Del. 1981). *Boland*, 423 Md. at 333–37. When reviewing a demand denial by an SLC, New York courts apply the same business judgment rule presumption as they do to denials made by a board of directors. *Auerbach*, 393 N.E.2d at 1001. The Delaware Supreme Court, by contrast, instructed courts to apply "[their] own independent business judgment" in evaluating these denials. *Zapata Corp.*, 430 A.2d at 788–89. In *Boland*, we adopted *Auerbach*'s presumption of reasonableness as to the substance of a board's decision, but imposed "rigorous" judicial review of an SLC's decision-making procedures. *Boland*, 423 Md. at 342. We explained, "The court's review, though not on the merits, can be rigorous on the questions of good faith, independence, and procedure." *Id.* With this standard, we balanced traditional judicial deference to corporate boards against our concern about a "tainted" board of directors utilizing a biased SLC to improperly benefit from the presumption of the business judgment rule. *Id.* at 337–42.

In this case, Petitioners urge us to expand the application of the *Boland* rule to **all** board decisions denying a shareholder litigation demand, regardless of whether the board consisted of a majority of disinterested directors or used an SLC.

14

## The Application of *Boland*

Petitioners argue that "institutional symbiosis" within a corporation requires courts to apply the enhanced *Boland* standard to any board decision denying a shareholder litigation demand. They contend that corporate boards are inherently biased whenever a shareholder makes a demand, and courts should not trust board members to pass judgment on other directors. Petitioners point to *Boland*, which noted that New York's deferential *Auerbach* approach had been criticized because it "does not acknowledge the structural bias inherent in a system which allows directors to judge the actions of their fellow directors." *Boland*, 423 Md. at 340 (quoting *Rosengarten v. Buckley*, 613 F. Supp. 1493, 1500 (D. Md. 1985)). Furthermore, Petitioners assert that enhanced scrutiny is even more appropriate in cases such as this one, when a board takes a recommendation from a committee rather than delegating the authority to make the decision exclusively to an SLC. Thus, they argue, no board decision denying a shareholder litigation demand should receive the benefit of the business judgment rule presumption. We disagree.

Petitioners' argument misperceives the rationale of the *Boland* decision. *Boland* involved a board of directors who stood to benefit from the transaction being challenged. In that context we imposed on the directors the burden to prove that the SLC members were independent, acted in good faith, and followed reasonable procedures. *Id.* at 341. We did so because the directors themselves had personal interests at stake in the resolution of the shareholder demand. *Id.* at 313–14. In other words, in *Boland*, the Court declined to permit a tainted board to preserve the full presumption of the business judgment rule by using an SLC. But in this case, Respondents' board of directors was both disinterested and

independent.[9]  Therefore, the concerns about the SLC's independence, good faith, and procedure that drove the *Boland* Court are simply not present here.

Petitioners argue that other states recognize the inherent bias involved in any shareholder litigation demand and grant shareholders greater protections accordingly. Thus, they contend, applying enhanced scrutiny to all board decisions denying litigation demands would not place Maryland outside of mainstream corporate law.  Specifically, Petitioners point to Delaware and New Jersey as states that have instituted greater shareholder protections to counteract inherent bias in the litigation demand process.  In Delaware, they argue, shareholders can demand documents related to their derivative claims and any denial of their litigation demand.  Petitioners also argue that New Jersey has adopted a modified business judgment rule that applies to all board demand denials. As explained below, these arguments are misplaced.

By statute, Delaware grants shareholders access to corporate documents upon a showing of a "proper purpose."[10]  Del. Code Ann. tit. 8, § 220(b) (2010).  Although Delaware's statute might provide broader shareholder access to corporate documents than

---

[9] Out of the six directors on the Board when it approved the 2011 Modification, Sugarman was the only one who financially benefitted from the decision.  The parties agree that the Board consisted of a majority of disinterested and independent directors when it approved the 2011 Modification.

[10] Del. Code Ann. tit. 8, § 220(b) (2010) provides:

> Any stockholder . . . shall . . . have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from: (1) The corporation's stock ledger, a list of its stockholders, and its other books and records . . . .

Maryland,[11] this legislative determination is hardly relevant to our decision whether or not to expand our common-law business judgement rule and its *Boland* exception. Furthermore, Delaware common law on this point is quite similar to ours—it only applies an additional layer of scrutiny when plaintiffs have put forth evidence demonstrating that a board was not disinterested and independent.[12] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (citations omitted). As to New Jersey, Petitioners are correct that *In re PSE & G Shareholder Litigation*, 801 A.2d 295, 312 (N.J. 2002), applied a *Boland*-like standard to all cases where the board denied a shareholder litigation demand, but this holding was later overruled by statute.[13] Therefore, contrary to Petitioners' assertion,

---

[11] In Maryland, any shareholder may inspect a corporation's bylaws, minutes of stockholder meetings, annual statements of affairs, and voting trust agreements. Md. Code (1957, 2014 Repl. Vol.), C & A § 2-512(a)(1)–(4). Shareholders who own more than five percent of any class of the outstanding stock of a corporation may also inspect a corporation's books of account, its stock ledger, a statement of affairs which "sets forth in reasonable detail the corporation's assets and liabilities as of a reasonably current date," and a list of stockholders. Md. Code (1957, 2014 Repl. Vol.), C & A § 2-513(a)–(b). Maryland does not grant shareholders the right to inspect any other corporate books or records.

[12] The Model Business Corporation Act, which 29 states had adopted in full or in large part as of 2005, also only places the burden of proof on the board when it does not have a majority of disinterested and independent directors. Model Bus. Corp. Act xxvii, § 7.44(d) (Am. Bar Ass'n 2005). Otherwise, it applies the traditional business judgment rule to denials of litigation demands. *Id.* at § 7.44(d). With our holding in this case we remain in accord with the Model Act and the states that have adopted it.

[13] In *In re PSE & G Shareholder Litigation*, 801 A.2d 295 (N.J. 2002), instead of the traditional business judgment rule, the court applied "a modified business judgment rule that imposes an initial burden on a corporation to demonstrate that in deciding to reject or terminate a shareholder's suit the members of the board" acted with sound business judgment. *Id.* at 312. But New Jersey enacted a statute in 2013 that shifts the initial burden of proof back to the plaintiff. N.J. Stat. Ann. § 14A: 3-6.5(3). Under the statute, if a shareholder brings a derivative suit after the litigation demand has been denied, the plaintiff

17

adopting enhanced scrutiny for all corporate board decisions denying shareholder litigation demands—interested or disinterested—would not put Maryland in line with either Delaware or New Jersey law.

Relying on Maryland's "demand futility exception," Petitioners further argue that if the Court does not extend the application of *Boland*, enhanced scrutiny will be limited to those rare instances when shareholders are not required to make a demand on the board before bringing suit. As a result, *Boland* scrutiny will be rarely applied.

We are not so persuaded. First, our purpose here is not to ensure *Boland*'s wide footprint. Second, we do not see *Boland* as so limited. *Boland* enhanced scrutiny is a useful and practical remedy for shareholders in smaller, usually non-public companies in which directors are often not disinterested. Third, Petitioner understates the narrowness of Maryland's demand futility exception. Demand is only excused when either "(1) a demand, or a delay in awaiting a response to a demand, would cause irreparable harm to the corporation" or "(2) a majority of the directors are so personally and directly conflicted or committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Werbowsky*, 362 Md. at 620. This exception to the demand requirement is quite narrow and does not encompass every instance in which a majority of the board of directors is interested. A director that expects to derive a personal benefit from a corporate transaction—and is therefore not disinterested—is not necessarily "so personally and directly conflicted or

---

must set out facts in the complaint establishing that the board of directors was not majority independent at the time the demand was made. *Id.*

18

committed to the decision in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule." *Id*.

Petitioners also make an overlapping argument—contending that we only apply enhanced scrutiny to SLC decisions to balance Maryland's narrow futility exception. Because it is difficult for shareholders to assert demand futility, Petitioners argue, the *Boland* court imposed enhanced scrutiny to maintain the feasibility of derivative suits. If *Boland* is only applied to cases where the board used an SLC, Petitioners contend, this balance will be disrupted. This argument mischaracterizes *Boland*'s rationale. *Boland* was concerned with the situation in which a board that does not have a disinterested majority appoints an SLC to address a litigation demand. The *Boland* Court expressed concern about SLCs serving as a puppet for the interested board, not the feasibility of shareholder derivative suits more broadly.[14] We decline to apply the *Boland* standard to all corporate boards that have refused a shareholder demand.

---

[14] Petitioners also argue that in both *Werbowsky* and *Boland* this Court advanced a policy of encouraging corporate boards to use SLCs to respond to shareholder litigation demands. If we decline to extend *Boland*, Petitioners contend, boards will be less likely to use SLCs because in doing so they would forfeit the protection of the business judgment rule. Petitioners argue that applying enhanced *Boland* scrutiny to all board decisions denying a litigation demand would remove this disincentive to using an SLC. This argument fails for two reasons. First, this Court has never advanced a policy of encouraging boards to use SLCs. In fact, this Court has recognized the importance of allowing disinterested directors to maintain control over derivative suits because they "necessarily intrude[ ] upon the managerial prerogatives ordinarily vested in the directors." *Werbowsky*, 362 Md. at 600. Second, under *Boland*, interested boards already have an incentive to use an SLC. Without one, an interested board's decision to deny a litigation demand is subject to the "entire fairness standard," as discussed *supra*. But with the use of an SLC, the board still receives deference as to the substance of the SLC's decision, and must only present evidence demonstrating a sound decision-making process.

19

**Direct or Derivative Claims**

Petitioners argue that their claims for breach of contract and promissory estoppel are direct shareholder claims, which are not subject to the business judgment rule. Thus, Petitioners contend, they should not have been dismissed for the failure to overcome the business judgment rule presumption. Whether a claim is direct or derivative depends on (1) "the nature of the wrong alleged" and (2) the relief that the plaintiff would receive if successful.[15] *Shenker*, 411 Md. at 346. To assert a direct claim, a plaintiff must have suffered a "distinct injury" separate from any harm suffered by the corporation. *Id.* at 345. The remedy that a shareholder seeks must benefit the shareholder as an individual, not the corporate entity. *Id.* at 346. Petitioners allege three harms that they argue give rise to direct claims: (1) the failure of the 2011 Modification to qualify for a tax deduction under 26 U.S.C. § 162(m) (2012); (2) the casting of an uninformed vote on the 2009 Plan; and (3)

---

[15] Petitioners argue that whether their breach of contract and promissory estoppel claims can be brought directly should be analyzed narrowly. Therefore, they argue, Delaware's two-part test for determining whether a claim for a breach of fiduciary duty is direct or derivative, established in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004), does not apply to their claims. In *Tooley*, the Delaware Supreme Court held that whether a claim for a breach of fiduciary duty was direct or derivative should depend only on: (1) who suffered the alleged harm and (2) who would receive the benefit of any recovery or other remedy. *Id.* Maryland's *Shenker* approach analyzes these same two factors. *Shenker*, 411 Md. at 346.

Petitioners are correct that this analysis should only be applied when the shareholder attempts to assert a claim for breach of fiduciary duty or otherwise enforce the corporation's own rights. *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1126–27 (Del. 2016). Before applying *Tooley*, courts should ask whether the plaintiff seeks to "bring a claim belonging to her personally or one belonging to the corporation itself." *Id.* at 1127 (citation omitted). We hold that Petitioners are asserting claims belonging to the corporation, and proceed with the *Shenker* and *Tooley* inquiry.

dilution in the value of their shares.  As we shall explain, none of these harms give rise to a direct shareholder claim.

Increased Tax Liability

Petitioners argue that they suffered harm when the 2008 Awards failed to qualify for a tax deduction under § 162(m) of the Internal Revenue Code.  26 U.S.C. § 162(m).  Section 162(m)(1) prohibits corporations from deducting compensation paid to the CEO or the four other highest paid corporate officers exceeding one million dollars.  Section 162(m)(4)(C), however, provides an exception for executive compensation paid to reward the achievement of shareholder-approved performance goals.  The 2009 Proxy Statement indicated that the 2009 Plan was meant "to ensure, for federal tax purposes, the deductibility of compensation recognized by certain participants in the 2009 Plan which may otherwise be limited by Section 162(m)."  When Respondents distributed the 2008 Awards in accordance with the 2011 Modification, the Awards did not qualify for the §162(m)(4)(C) exception because they were no longer based on a shareholder-approved performance plan.  Presumably, iStar paid taxes on the Awards in accordance with § 162(m)(1).  But this financial loss to the corporation does not give rise to a direct shareholder claim.  Petitioners have not alleged any harm related to this tax cost distinct from that suffered by the corporation.  In fact, Petitioners' Prayer for Relief asked for the damages sustained by the corporation.

Petitioners nevertheless attempt to maintain their direct claims by arguing that the 2009 Plan grants them contract rights that they may enforce directly.  In support of their argument, they point to *NAF Holdings, LLC v. Li & Fung (Trading) Limited*, 118 A.3d 175

21

(Del. 2015), as an example of when the Delaware Supreme Court allowed a shareholder to bring a breach of contract claim directly even though the shareholder's loss derived from the corporation's loss.[16] In *NAF Holdings*, the shareholder entered into a contract with a third party to serve as the sourcing agent for the shareholder's subsidiary corporation. When the third party defendant breached the contract, the subsidiary corporation suffered financial loss, and its stock value decreased. Consequently, the shareholder also suffered economic harm. Even though the shareholder's harm flowed directly from the corporation's loss, the court declined to require the shareholder to bring a derivative suit. It explained, "[I]t is of course true that [the shareholder] cannot bring direct contractual claims belonging only to its subsidiaries without first proving demand futility. But this does not mean that [the shareholder] must proceed derivatively as to contract claims [the shareholder] itself possesses." *Id.* at 180. The court allowed the shareholder to bring the claim because its commercial contract granted it distinct rights separate from those of the corporation. *Id.* at 179. The court concluded, "It would be inconsistent with [corporate] legal principles to subject commercial parties to a burdensome demand excusal process before allowing them to sue on their own commercial contracts." *Id.* at 181.

---

[16] Petitioners also point to *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586 (2011), to support their argument that they can assert a direct breach of contract claim for harm suffered by the corporate entity. In *Wasserman*, however, a partner brought suit against a managing member of his partnership for the breach of partnership agreements. *Id.* at 602. The Court of Special Appeals allowed the appellants to proceed with a direct claim, but specifically distinguished the case from a derivative suit in the corporate context. It explained, "[A]ppellants' goals are unlike the goals of corporate shareholders, who strive to increase stock value and ownership interest. In addition, the type of harm here is not the indirect harm that appellants would suffer if the entities in question were in another type of business." *Id.* at 622.

Petitioners argue that the 2009 Plan constitutes a contract between the Board and the shareholders, and Respondents breached that contract when they implemented the 2011 Modification. Thus, they argue, in accordance with *NAF Holdings*, they can assert their breach of contract claim directly. Petitioners put forth two theories under which the 2009 Plan is a contract. First, they argue that because the Plan contains "all the essential material terms" of the agreement between the shareholders and the Board, it constitutes a contract. Second, Petitioners argue that the "intra-corporate contract" consisting of a corporation's certificate of incorporation and bylaws includes equity compensation plans such as the 2009 Plan. Because the 2009 Plan was approved in New York, and it expressly provides that it is to be governed by New York law, we will apply New York law in determining whether the Plan constitutes a contract.[17]

Petitioners argue that a contract can be created if a written document contains "all the essential material terms" of an agreement.[18] This definition misstates New York law. Under New York law, "[t]o establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent

---

[17] Maryland abides by the common law doctrine of *lex loci contractus*, which applies the law of the jurisdiction where the contract was made "when determining the construction, validity, enforceability, or interpretation of a contract." *Cunningham v. Feinberg*, 441 Md. 310, 326 (2015) (citation omitted).

[18] Petitioners rely on *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43 (N.Y. App. Div. 2009), for this proposition. But *Kowalchuk* does not address the issue of contract formation. In *Kowalchuk*, both parties conceded that an offer had been made, and the issue before the court was whether the offer had been revoked before it was accepted. *Id.* at 46.

23

to be bound."[19] *Kolchins v. Evolution Mkts., Inc.*, 8 N.Y.S.3d 1, 9 (N.Y. App. Div. 2015) (citing 22 N.Y. Jur. 2d, Contracts § 9). The New York Court of Appeals has further explained, "A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." *Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953).

An examination of the language of the 2009 Plan reveals that it does not constitute a contract. The 2009 Plan does not contain any provision extending a contract offer to the shareholders. Unlike the Proxy Statement and its accompanying letters, the 2009 Plan does not address the shareholders. It does not make a promise to shareholders in exchange for any action or promise in return. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981) ("[A] contract is a private 'ordering' in which a party binds himself to do, or not to do, a particular thing."). Furthermore, several provisions of the 2009 Plan suggest that the Board did not intend to be strictly bound by its terms. For example, Section 12(b) authorizes the Board or a committee it appoints to "make such changes to the Plan as may be necessary or appropriate to comply with the rules and regulations of any government authority or to obtain tax benefits applicable to an Award." Section 13(iii) provides that the Board or a committee may "take any other actions and make any other determinations or decisions that it deems necessary or appropriate in connection with the Plan or the administration or interpretation thereof." Section 13(iii)

___

[19] Maryland law also requires a clear offer for a contract to be formed. *Cochran v. Norkunas*, 398 Md. 1, 23 (2007) ("Creation of a contract requires an offer by one party and acceptance by the other party.").

also states, subject to certain limitations, "The Board may amend the Plan as it shall deem advisable . . . ." Additionally, the 2009 Plan specifically allows the Board to terminate the 2009 Plan at any point. This language weighs heavily against the finding of a contract.

Petitioners also argue that the 2009 Plan is part of a larger "intra-corporate contract" between the directors and the shareholders. Both Maryland and New York recognize a corporation's certificate of incorporation as a contract between shareholders and the corporation. *See McQuillen v. Nat'l Cash Register Co.*, 27 F. Supp. 639, 645 (D. Md. 1939) (describing a corporate charter as a contract between the corporation and shareholders); *Warren v. Fitzgerald*, 189 Md. 476, 485 (1948) (corporate charter is a "contract between stockholders" and "between the corporation and the State"); *Mgmt. Techs., Inc. v. Morris*, 961 F. Supp. 640, 646 (S.D.N.Y. 1997) ("[A] company's certificate of incorporation and by-laws in substance are a contract between the corporation and its shareholders."). Delaware also recognizes that a company's certificate of incorporation and bylaws make up a contract between directors, officers, and stockholders, and that shareholders can bring direct claims to enforce that contract when they have been distinctly harmed. *See STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."); *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1107–08 (Del. Ch. 2014) ("[T]he certification of incorporation, and the bylaws [ ] constitute a multi-party contract among the directors, officers, and stockholders of the corporation" that shareholders can directly enforce. (footnote omitted)). Equity compensation plans, however, have not been recognized as a part of any larger contract between corporate

25

boards and shareholders in Maryland, New York, or Delaware.[20]  Therefore, without language indicating a clear offer and an intent to be bound, we conclude that the 2009 Plan is not a contract between the Board and iStar shareholders.

## Uninformed Vote

Petitioners argue that if the 2009 Plan did not create a contract between the shareholders and directors, the 2009 Proxy Statement and accompanying letters still give rise to a promissory estoppel claim.  To make out a claim for promissory estoppel, Petitioners must show that (1) the directors made a clear and definite promise; (2) the directors had a reasonable expectation that the promise would induce shareholder action; (3) the promise did induce such action; and (4) the shareholders suffered an injustice that can only be avoided by the enforcement of the promise.  *See Pavel Enters., Inc. v. A.S. Johnson Co.*, 342 Md. 143, 166 (1996) (adopting the elements for promissory estoppel from *Restatement (Second) of Contracts* § 90(1) (1979) as Maryland law).  Petitioners argue that the directors promised them that the 2008 Awards would only vest if certain conditions were met, and that promise induced them to vote to approve the 2009 Plan. Because of this inducement, Petitioners argue, they cast an uninformed vote.

To satisfy the first element of a claim for promissory estoppel, Petitioners must establish that the 2009 Proxy Statement and accompanying letters made them "a real promise—mere expressions of expectation, opinion, or assumption are insufficient."

---

[20] We decline to consider the unreported case law that Petitioners refer to on this point.  Maryland Rule 1-104 states that unreported opinions of this Court and the Court of Special Appeals are "neither precedent within the rule of stare decisis nor persuasive authority."

26

*Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 804 (Del. Ch. 2007), *aff'd*, 956 A.2d 32 (Del. 2008) (footnote omitted). In a letter to shareholders introducing the Proxy Statement, the Board urged the approval of the 2009 Plan. It told shareholders, "The performance-based awards we have granted will vest **only if** performance conditions are achieved over measurement periods of up to three years and **if** additional service-based vesting periods of up to three years are satisfied." (Emphasis added.) In the Proxy Statement itself the Board again assured shareholders that the 2008 Awards "will vest **only if** a specified price target for our common stock is achieved within three years and **if** the employee is employed on the subsequent vesting dates." (Emphasis added.) This language could constitute a clear and definite promise on the part of the Board.

Relying on a Delaware Chancery Court's decision in *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, Respondents argue that statements within a proxy statement can never amount to a clear and definite promise. We are not so certain. *Goldman* involved a third party's claim to money a shareholder received when a corporation was liquidated. The U.S. Virgin Islands brought suit against the former shareholder for the corporation's environmental contamination. *Goldman, Sachs & Co.*, 937 A.2d at 806. The Virgin Islands argued that the following sentence within a proxy statement the corporation issued to shareholders estopped the former shareholder from retaining the funds:

> If the amount held in the Liquidating Trust is insufficient to discharge fully all liabilities which arise, or if liabilities arise after the Liquidating Trust is terminated, each [ ] stockholder

> *may* be liable for any unpaid portion of such liabilities to the extent of the liquidating distributions paid to him.

*Id.* at 805. In analyzing the Virgin Island's promissory estoppel claim, the court stated, "Descriptive statements in disclosure statements do not amount to a promise." *Id.* But this third party claim does not present an analogous situation to a shareholder's promissory estoppel claim against its own board of directors—the situation at issue here.

Next, Petitioners suggest that the Board had a reasonable expectation that its promise would induce the shareholders to vote to approve the 2009 Plan, and that the shareholders in fact did so—the second and third elements of a promissory estoppel claim. The Board concluded its introductory letter by telling shareholders, "The board of directors believes that the significant shareholder returns required in order to meet the performance hurdles of these proposed equity incentive awards . . . make the overall compensation strategy a compelling one for shareholders . . . ." On May 27, 2009, the shareholders voted to approve the 2009 Plan. We conclude that the facts alleged are sufficient to make a prima facie showing for the second and third elements.

The fourth element is the hurdle Petitioners cannot clear—they have not alleged an injustice that can only be avoided by the enforcement of the promise.[21] To demonstrate an injustice, "[l]ogically, injury is required; without injury there would be no injustice in not enforcing the promise." Joseph M. Perillo, Contracts § 6.1, at 230 (7th ed. 2014). It is not

---

[21] Petitioners cite to *In re Ebix, Inc. Stockholder Litigation*, No. 8526-VCN, 2014 WL 3696655 (Del. Ch. July 24, 2014), to support their proposition that an uninformed vote constitutes a detriment that can give rise to a claim of promissory estoppel. As discussed *supra*, however, we decline to consider unreported case law.

28

sufficient for Petitioners to show that they acted in reliance on Respondents' promise. "[E]ven the most substantial action or forbearance may not create an unjust situation, as when the promisee, although she has engaged in clear action . . . is not injured as a result." Richard A. Lord, Williston on Contracts § 8:7, at 165 (4th ed. 2008). Judge Posner has further explained, "To 'rely,' in the law of promissory estoppel, is not merely to do something in response to the inducement offered by the promise. There must be a **cost** to the promisee of doing it." *Cosgrove v. Bartolotta*, 150 F.3d 729, 733 (7th Cir. 1998) (citations omitted) (emphasis added).

No court has analyzed whether the casting of an uninformed vote satisfies the fourth element of a promissory estoppel claim. Delaware cases evaluating whether the harm of an uninformed vote supports a direct claim generally are instructive on this question. Delaware courts require plaintiffs to allege individual damages due to the uninformed vote—not just damages to the corporation. In *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 919 A.2d 563 (Del. Ch. 2007), shareholders brought a direct class action claim against a corporation for material misrepresentations in a proxy statement. They claimed that if certain transactions had been revealed in the statement, the shareholders may not have elected the current directors, so the election results should be invalidated. *Id.* at 580. The Chancery Court agreed that the shareholders' claim was direct rather than derivative. It explained, "Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is almost always an individual, not corporate, harm." *Id.* at 601. But this proved to be a

hollow victory—the court dismissed the claim because the "plaintiffs [ ] failed to suggest any form of relief that [could] be granted to them in a direct claim." *Id.* at 602.

In *In re J.P. Morgan Chase & Co. Shareholder Litigation*, 906 A.2d 766 (Del. 2006), shareholders brought a direct claim against directors for allegedly inducing them to approve a merger "with a proxy statement that contained materially inaccurate or incomplete disclosures." *Id.* at 768. A New York Times article had revealed to the shareholders that J.P. Morgan Chase could have purchased Bank One at a lower price if they had agreed to allow the Bank One CEO to become CEO of the merged entity immediately, rather than at a later date. *Id.* at 769. The Delaware Supreme Court acknowledged "that where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct." *Id.* at 772. The court dismissed the claim, however, because the shareholders failed to assert direct, individual damages. The court rejected the shareholders' theory of damages—the difference between the potential Bank One purchase price and the actual purchase price—reasoning that the price difference had "no logical or reasonable relationship to the harm caused to the shareholders *individually* for being deprived of their right to cast an informed vote." *Id.* at 773 (emphasis in original). The shareholders were denied even nominal damages for injury to their voting rights because their voting rights remained unchanged after the merger. *Id.* at 773–74.

We are persuaded by the reasoning of the Delaware Supreme Court, and hold that, because Petitioners have not alleged any individual damages due to their uninformed vote

on the 2009 Plan, their uninformed vote, by itself, fails to sufficiently support their promissory estoppel claim.

Share Dilution

During oral argument, Petitioners argued that they suffered direct harm because the value of their iStar shares was diluted when the corporation issued additional stock through the 2009 Plan. Therefore, Petitioners contend, they can bring direct shareholder claims to remedy this harm. Respondents reply that any dilution in the value of Petitioners' stock is a result of harm suffered by the corporation. Thus, such claims can only be asserted derivatively. Although we agree with Petitioners that financial harm due to stock dilution could support a direct shareholder claim under some circumstances, the allegations here do not suffice.

As discussed *supra*, a harm suffered by both the shareholders and the corporation alike can only support a shareholder derivative claim. In *Waller v. Waller*, 187 Md. 185 (1946), this Court explained that even when injury to a corporation "may incidentally result in diminishing or destroying the value of the stock," a lawsuit to recover damages "can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder." *Id.* at 189–90. Because both the shareholders and the corporation have suffered the same financial loss, a decline in stock value does not give rise to a direct claim. Instead, to maintain a direct action, the shareholder must allege that he has suffered "an injury that is separate and distinct from any injury suffered either directly by the corporation or indirectly by the stockholder because of the injury to the

31

corporation." James J. Hanks, Jr., Maryland Corporation Law § 7.12(b), at 276.18 (1994, 2015 Supp.).

In general, Delaware law does not distinguish between a decrease in stock value due to the corporation's financial loss and a decrease in stock value due to the issuance of additional shares—or dilution. The Delaware Supreme Court has held that when a shareholder alleges corporate overpayment in a transaction where the payment was stock, those claims are "not normally regarded as direct, because any dilution in value of the corporation's stock is merely the unavoidable result (from an accounting standpoint) of the reduction in the value of the entire corporate entity, of which each share of equity represents an equal fraction." *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006). The court further explained, "In the eyes of the law, such equal 'injury' to the shares resulting from corporate overpayment is not viewed as, or equated with, harm to specific shareholders individually." *Id*. Thus, to redress this wrong, shareholders must bring a lawsuit derivatively. *Id.*

The Delaware Supreme Court permits direct claims, however, when minority shareholders have suffered a substantial decrease in the value of their stock due to share dilution. It first recognized such a claim in *In re Tri-Star Pictures, Inc., Litigation*, 634 A.2d 319 (Del. 1993), where the court explained that the economic harm due to share dilution was "the reduction in value of the minority stockholders' shares, determined by the liquidation value of each share both before and after [the business decision]." *Id.* at 330. Furthermore, the court recognized that the plaintiffs "suffer harm by voting power dilution which, in essence, is no more than a relative diminution in the minority's

32

proportionate influence over corporate affairs." *Id.* (footnote omitted). Accordingly, the

court allowed the plaintiffs' direct claims to proceed. *Id.* at 335.

The Delaware Supreme Court expanded on this theory in *Gentile v. Rossette,* in

which shareholders alleged that the corporation wrongly granted newly issued stock to its

CEO and controlling shareholder in exchange for the forgiveness of an outstanding debt.

The shareholders alleged that the stock issued to the CEO exceeded the value of the debt

owed. *Gentile*, 906 A.2d at 93. Relying on *Tri-Star*, the shareholders argued that the board

"wrongfully reduced the cash-value and the voting power of the public stockholders'

minority interest, and increased correspondingly the value and voting power of the

controller's majority interest." *Id.* at 93, 99. The court held that shareholders can assert a

dilution claim directly if the following requirements are met:

> (1) a stockholder having majority or effective control causes
> the corporation to issue 'excessive' shares of its stock in
> exchange for assets of the controlling stockholder that have a
> lesser value; and (2) the exchange causes an increase in the
> percentage of the outstanding shares owned by the controlling
> stockholder, and a corresponding decrease in the share
> percentage owned by the public (minority) shareholders.

*Id.* at 100. Under these limited circumstances, the court explained, share dilution gives rise

to both a direct and a derivative claim.[22] *Id.* We agree with the Delaware court that *Gentile*

stated a direct claim. We decline, however, to adopt the second limiting circumstance.

_____

[22] One year after *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), in *Gatz v. Ponsoldt*, 925 A.2d 1265 (Del. 2007), the Delaware Supreme Court allowed shareholders to bring a direct claim for breach of fiduciary duty against the corporation's directors and majority shareholders on a share dilution theory even though the newly issued shares were granted to a new shareholder, rather than an already-controlling one. *Id.* at 1281. But in 2016, the court declined to further extend *Gentile*'s holding to allow a limited partner to bring a direct

In Maryland, a shareholder must only show that she has suffered an injury distinct from the corporation to bring a direct claim—not that she has suffered an injury distinct from other shareholders. *Matthews v. Headley Chocolate Co.*, 130 Md. 523, 536 (1917) (requiring "some peculiar injury independent of what the company has suffered" for shareholders to assert direct claim) (citations omitted). This Court explained in *Shenker*, "That the plaintiff suffered his or her injury in common with all other shareholders is not determinative of whether the injury suffered is direct or indirect." 411 Md. at 345.

Maryland courts have not addressed the question of whether a shareholder can assert a direct claim based on share dilution. But in *Strougo v. Bassini*, 282 F.3d 162 (2d Cir. 2002), the United States Court of Appeals for the Second Circuit applied Maryland law to that question. The *Strougo* shareholders alleged that when an investment fund issued additional shares of stock and offered them to existing shareholders for purchase, it diluted the value of each outstanding share and harmed shareholders who decided not to purchase more shares through the offering. The Second Circuit suggested that the shareholders may be able to bring direct claims for share dilution as a result of this stock offering. Although the court expressed concern over redressability, it explained the distinct nature of the shareholders' injury:

> It is clear [ ] that the claims of the shareholders generally cannot be dismissed for failure to state a direct, as opposed to derivative, claim, as the district court did. The alleged injuries resulting from the coercive nature of the rights offering **do not derive from a reduction in the value of the Fund's assets or**

---

claim for overpayment when he did not allege voting rights dilution or an increase in the general partner's control at the expense of the limited partners. *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, No. 103, slip op. at 28 (Del. Dec. 20, 2016).

**any other injury to the Fund's business**. Indeed, with reference to the shareholders that purchased new shares in order to avoid dilution, the acts that allegedly harmed the shareholders increased the Fund's assets. And as for the non-participating shareholders, the reduced value of their equity did not derive from a reduction in the value of the Fund's assets, but rather from a reallocation of equity value to those shareholders who did participate.

*Id.* at 175 (emphasis added). The court then remanded the case for the District Court to determine whether any duty to the shareholders was breached by the offering, and if so, what remedy would be appropriate. *Id.* at 176.

We agree that share dilution in some circumstances can support a direct claim. But the allegations of the complaint fall short of what is required. Petitioners did not allege share dilution in their complaint. On appeal, they contend that the 2009 Plan caused share dilution, but they fail to allege any facts detailing the impact of such dilution. We do not know by how much Petitioners' shares were allegedly diluted, what effect that dilution had on Petitioners' voting power, if any, or what financial loss they might have suffered due to such dilution. Petitioners have not even alleged that the stock price decreased after the 2009 Plan was executed.[23] *See N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1024 (9th

---

[23] Additionally, in the 2009 Proxy Statement, the Board asserted that the 2009 Plan would not have noticeable dilutive effect on outstanding shares of stock. The Board explained, "Our repurchases of approximately 32.6 million shares of our common stock in open market transactions from July 1, 2008 through March 31, 200[9] effectively offset any dilution that would be created by issuing shares pursuant to the December 19, 2008 performance-based awards to employees." The Board further stated that even if "*all* performance targets are met, all employees fulfill their timing vesting obligations and shares are issued upon vesting of all of the [2008 Awards], total shares outstanding at December 31, 2011 will have been reduced approximately 17% since July 1, 2008." Petitioners have not alleged any facts contrary to these assertions.

Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012) (holding that "economic loss does not necessarily accompany dilution, so [ ] conclusory allegations of loss are insufficient" to state a claim under the Securities Exchange Act for material misrepresentation in a proxy statement).

For these reasons, Petitioners' direct claims for breach of contract and promissory estoppel cannot proceed on a share dilution theory.

### Direct Duty to Shareholders

Petitioners argue that even if they have not suffered a harm distinct from that of the corporation, the 2009 Plan created a duty owed to the shareholders by the corporation which gives rise to a direct claim. They rely on *Shenker v. Laureate Education, Inc.*, where the Court wrote, "[A] shareholder may bring a direct action . . . when the shareholder suffers the harm directly **or** a duty is owed directly to the shareholder, though such harm also may be a violation of a duty owing to the corporation." 411 Md. at 345 (emphasis added) (citation omitted). Thus, if the corporate board has breached a duty owed directly to the shareholders, Petitioners argue, they do not have to demonstrate a distinct harm to bring a direct claim. But *Shenker* did not eliminate the requirement that a shareholder must have suffered an injury distinct from that suffered by the corporation to bring a direct claim. In so far as the Court suggested that a breach of a duty to shareholders alone—absent any separate harm—could support a direct shareholder claim, the facts of *Shenker* and subsequent case law applying it demonstrate that this is not Maryland law.

In *Shenker*, shareholders sued the directors for a breach of their fiduciary duty during merger negotiations. The shareholders alleged that the directors did not negotiate

36

the highest possible price per share during a cash-out merger. In allowing the lawsuit to proceed, we held that "in the context of a cash-out merger transaction, where the decision to sell the corporation already has been made, corporate directors owe their shareholders common law duties of candor and good faith efforts to maximize shareholder value." *Id.* at 336. We also held that breaches of these duties could be pursued through a direct shareholder claim because the shareholders' injury was separate from the corporation's. *Id.* We explained that "the injury alleged, namely, a lesser value that shareholders received for their shares in the cash-out merger, is an injury suffered solely by the shareholders and not by [the] corporate entity." *Id.* at 346. We continued, "Such an injury, if suffered, is a direct one . . . **thus allowing** Petitioners to proceed with their direct action against Board Respondents." *Id.* (emphasis added). Our decision to allow the shareholders to bring a direct claim was squarely based upon the fact that the shareholders had suffered injury separate from the corporation.

In *George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay*, 197 Md. App. 586 (2011), the Court of Special Appeals "extend[ed] the rationale in *Shenker* to the law of partnerships and LLCs," and therefore required that the plaintiffs show both a direct harm **and** the breach of a duty owed specifically to the plaintiffs. *Id.* at 620–21 (emphasis added) (noting that "*Shenker* has a narrow application in the corporate context"). In *Boland*, we explained that "[w]e held [the *Shenker*] claim to be direct, as the fiduciary claims were based on a breach owed directly to the shareholder, **and** the injury was suffered solely by the shareholders and not by the corporate entity." 423 Md. at 316 (emphasis added) (internal quotation marks and brackets omitted). Despite *Shenker*'s dicta

37

suggesting otherwise, we hold that to bring a direct claim shareholders must show that they have suffered harm distinct from that of the corporation. Here, Petitioners have not done so. Thus, their claims are derivative.

## CONCLUSION

Petitioners' claims were properly dismissed by the Circuit Court for failure to overcome the business judgment rule presumption. Additionally, Petitioners' claims for breach of contract and promissory estoppel are derivative claims that are subject to the business judgment rule. Thus, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**