*Wm. T. Burnett Holding LLC, et al. v. Berg Brothers Company, et al.*

No. 1727, September Term 2016

**Contracts – Third-Party Beneficiary**

Appellant, a neighbor of appellee, may have been an incidental beneficiary of a consent agreement between appellee and the Baltimore City Department of Housing and Community Development (DHCD) that resolved appellee's appeals of DHCD zoning violation notices, but it was not an intended beneficiary of that agreement. It therefore had no standing to enforce the agreement and no standing to seek a declaratory judgment that the agreement had been breached by appellee. Status as a third-party beneficiary is questionable where the contract is with a government agency and involves a regulatory matter within the statutory jurisdiction of that agency.

**Promissory Estoppel Based on Forbearance**

(1) Appellant, who was not a party to the agreement between DHCD and appellee, was not entitled to enforce the agreement on the ground that, contemporaneously with the agreement, appellant had withdrawn its objections to appellee's appeals of the DHCD violation notices. Neither the Court of Appeals not this Court has yet adopted the *Restatement (Second) of Contracts* §90(1) view that a promise made to a third person, not a party to the agreement, which induces action by that person may be enforced by that third person. *See Pavel v. A.S. Johnson*, 342 Md. 143, 166 (1996)

(2) Even if §90(1) were applicable, appellant would not be entitled to the relief it sought in this case.

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1727

September Term, 2016

---

WM. T. BURNETT HOLDING LLC, *et al*.

v.

BERG BROTHERS COMPANY, *et al*.

---

Eyler, Deborah S.
Friedman,
Wilner, Alan M. (Senior Judge, Specially
Assigned)

JJ.

---

Opinion by Wilner, J.

---

Filed: December 21, 2017

BACKGROUND

Appellants, Wm. T. Burnett and Ellicott Dredges, LLC (hereafter referred to collectively as Burnett/Ellicott), and appellee Berg Brothers Company (Berg) are neighbors in the Carroll Camden Urban Renewal Area of South Baltimore. Berg owns two properties, one at 1500 Bayard Street, which it uses as a scrap metal processing yard, and one at 1434-1438 Wicomico Street, an intersecting street, on which it operates a materials recovery facility. Both properties are in an M-2-3 Industrial zone. A scrap metal yard is not a permitted use in an M-2-3 zone, but the yard on Bayard Street has been allowed to continue as a lawfully existing non-conforming use.

Burnett/Ellicott are adjoining and across-the-street neighbors of Berg's scrap yard and recycling operations. Their facilities are a mixed use of corporate offices, conference and meeting rooms, and manufacturing and warehouse facilities. Their businesses, they claim, attract a lot of customer visits, many of whom "react negatively to Berg's unsightly operations." That negative reaction, they say, has been harmful to them. A particular sore spot was the ten-foot-high metal fence that enclosed Berg's properties. The fence consisted of large steel plates that were bolted together and topped with highway guard rails. Burnett/Ellicott complained to Berg a number of times, to no avail.

The genesis of what is before us was several violation notices issued to Berg by the City Department of Housing and Community Development (DHCD) over a 14-month period, from December 2011 to March 2013. On December 20, 2011, DHCD issued Violation Notices Nos. 79414A-1 and 79414A-2, both concerning the fencing. No.

1

79414A-1 charged that the fencing at 1434-1438 Wicomico Street was erected without a permit and at a height higher than permitted by the City Building and Fire Code. No. 79414A-2 alleged that the fencing at 1500 Bayard Street also was erected without a permit. Both of those notices directed Berg to remove all work done without a proper permit and to obtain all required permits within 30 days. On March 1, 2013, DHCD issued Violation Notice No. 936053A-1, alleging land use without a proper occupancy certificate or use permit at 1500 Bayard Street. Berg was ordered to discontinue the unlawful use or obtain the proper certificates or permits within 30 days.[1]

Berg appealed all three notices to the Baltimore City Board of Municipal and Zoning Appeals (BMZA). On July 31, 2012, in response to Notice Nos. 79414A-1 and 79414A-2, Berg requested a variance for a fence ten feet high and 550 feet in length for the Wicomico Street property and ten feet high and 600 feet in length for the Bayard Street property. On March 14, 2013, Berg objected to Notice No. 93605A-1.

Burnett/Ellicott filed an opposition to all three appeals. With respect to the Bayard Street property, it acknowledged that a scrap metal operation became a lawful non-conforming use in 1972 but argued that that status terminated shortly thereafter when the property ceased being used as a scrap metal yard and was used instead as a parking lot for some period of time. It also asked that the fencing around both properties be removed and replaced with "attractive screening that completely shields from view the

_____

[1] The record reveals that an additional Violation Notice, No. 790403A-3, was issued on December 20, 2011 with regard to the fencing around the Bayard Street property. See Extract at E-951. It is not clear what happened with regard to that Notice.

2

junkyard-like operations." In a supplement to its opposition, Burnett/Ellicott argued that the operation on Wicomico Street also was illegal, noting that the 2009 permit for that operation was based on the operation being conducted within an enclosed building and not as an open junk or scrap storage yard.

The appeals remained dormant until October 2013. During the summer of that year, negotiations involving Berg, Burnett/Ellicott, and DHCD commenced, with a focus on replacing the existing fencing with a more aesthetic wall. Those negotiations eventually bore fruit in the form of an agreement between Berg and DHCD signed on October 15, 2013. Burnett/Ellicott was not a named party to the agreement and did not sign it.

The Agreement recited that its purpose was to resolve all outstanding violation notices and appeals pending before BMZA regarding uses and structures located at 1500 Bayard Street and 1434-38 Wicomico Street and, to that end, stated that "the parties to this appeal," which it identified as Berg as the appellant and DHCD as the appellee, "agree to the following facts and terms." The rest of the Agreement was in two parts – a recitation of the procedural history, including the violation notices, the appeals by Berg, and the opposition filed by Burnett/Ellicott – and the remedial terms to which the two parties had agreed.

The relevant terms were that:

(1) Berg would construct a masonry wall ten feet high and 420 feet in length at 1500 Bayard Street, as depicted on an attached Exhibit B, using the materials

described in another attached exhibit, the purpose of which was to screen the contents and activity at both the Bayard Street scrap yard and the Wicomico Street processing yard;[2]

(2) Berg would maintain and operate all structures at both locations in sound condition, in good repair, and in compliance with applicable City health, zoning, fire, and related codes;

(3) During non-operational hours, the stock piles of materials would be maintained so as not to be visible from the sidewalks across the street from the properties;

(4) All construction of the wall and the gates as depicted on the attached exhibit would be completed by March 31, 2014;

(5) Berg would obtain all permits necessary for the construction of the wall and gates, and DHCD would support any zoning variances or minor privilege applications necessary to complete the project;

(6) DHCD agreed that the use at 1500 Bayard Street was and has been a legally existing non-conforming scrap metal processing yard and that the last approved use on Wicomico Street is as a materials recovery facility approved by BMZA in 2008;

---

[2] There is a major inconsistency between the text of the Agreement and what is depicted on Exhibit B. As noted, the text of the Agreement refers to a 420-foot wall at 1500 Bayard Street. Exhibit B shows a wall that, at oral argument, the parties estimated was approximately 1,400 feet in length that was to run also along Hamburg Street and Wicomico Street and enclose the Berg properties. The parties agreed that Exhibit B accurately showed what was to be constructed.

(7) The Agreement would not limit the ability of DHCD to secure compliance with other applicable codes and ordinances by any other legal, equitable, or administrative means and not "limit in any way the legal, equitable or administrative rights" of Burnett/Ellicott;

(8) If Berg failed to "materially comply" with the terms of the Agreement, DHCD would issue a Notice to that effect and give Berg ten days to cure the non-compliance; and

(9) If Berg failed to comply with the Notice, "the non-conforming use at 1500 Bayard as a scrap metal processing yard shall be forever terminated," subject to Berg's right to appeal the notice of final termination.

On the same day that the Agreement was signed, it was filed with BMZA and, at a public hearing before that Board, Burnett/Ellicott formally withdrew its oppositions to the Berg appeals. On October 21, 2013, the Board adopted a Resolution granting the appeals and incorporating the terms of the Agreement as part of the Resolution.

Berg commenced preparations to construct the wall but ran into a number of problems, one of which required that it obtain a minor privilege permit from the City. A timely application was made for the permit on February 5, 2014 but there was a delay in processing the application, for which the City accepted responsibility. The permit was not actually issued until March 20. Accordingly, the City agreed to extend the time for completion by six weeks, until May 10, 2014. No objection to that extension was made by Burnett/Ellicott.

5

On March 25, Berg applied for a building permit for construction of the wall. During the application process, however, sewer drains, of which Berg previously was unaware, were discovered that blocked the anticipated location of footers for the wall, requiring revisions to the permit. A final building permit was issued on May 1, and Berg promptly commenced construction. DHCD inspected the site on May 13 and, though verifying progress consistent with the permit, concluded that construction of the wall was not materially complete. DHCD therefore issued a Notice of Default and Order to cure the non-compliance by May 23, 2014.

Burnett/Ellicott did not wait until May 23 to act. On May 16, it filed a complaint against Berg in the Circuit Court for Baltimore City accusing Berg of maintaining a public and private nuisance. DHCD, having inspected the site, concluded that satisfactory progress was being made. On May 27, Burnett/Ellicott amended its complaint (1) to add DHCD as a defendant, and (2) to seek a declaratory judgment that the non-conforming use at 1500 Bayard Street had been forever terminated by reason of Berg's failure to complete construction of the wall by May 23, 2014.

Berg responded with a request to BMZA to extend the time for completion. BMZA denied the request on the ground that it was not a party to the agreement and had no authority to modify it. Eventually, however, and over Burnett/Ellicott's strenuous objection, DHCD, through a Modified Consent Agreement with Berg, did extend the time for completion to July 18, 2014. That agreement recited that the DHCD inspection on May 26 showed that the wall was more than fifty percent complete, that DHCD considered the material progress to have cured the non-compliance, and that "[i]n light

6

of the material progress, DHCD agreed to allow Berg to complete construction of the wall in accordance with the issued building permit and agreed that Berg's non-conforming use had not ceased due to non-compliance with the Consent Agreement." The Modified Agreement noted that on July 14, 2014, "DHCD issued final building approval of the newly constructed wall pursuant to the plans and permit issued by DHCD." Accordingly, the Consent Agreement was modified to require completion of the wall by July 18, 2014.

Intent on putting Berg out of business notwithstanding that the wall it had wanted all along had been completed, Burnett/Ellicott filed a Second Amended Complaint to allege that "any attempt by Berg and [DHCD] to amend or modify the deadline or cure provisions of the October 15 Agreement after May 24, 2014, without the agreement of Plaintiffs would be impermissible, invalid or voidable for lack of consideration and otherwise as well as under equitable principles of promissory estoppel and detrimental reliance." Burnett/Ellicott based its ability to enforce the October 15, 2013 Agreement on the fact that it had participated in the negotiations leading to that Agreement and, as part of the Agreement, had withdrawn its objections to Berg's then-pending appeals.

After motions to dismiss and for summary judgment were denied, the case was tried over a two-week period in July 2016. On September 26, 2016, the court entered its findings that Burnett/Ellicott had failed to prove either a private or public nuisance and that it lacked standing to seek the declaratory relief it requested. With respect to the latter conclusion, the court held:

7

"[The function of DHCD] is to enforce the zoning laws of Baltimore City to the benefit of the entirety of the citizenry of the city.  The [DHCD] would not have contemplated ceding to the Plaintiffs (or for that matter, any other complaining constituent) the agency's ability to enforce the zoning laws of the City of Baltimore as under such a precedent anarchy would/could ensue.  Under such circumstances, those disgruntled with the [DHCD]'s determinations could climb over its back and seek their own relief.  Clearly, that makes no sense from a policy and/or practice standpoint.

That the Agreement mentions that the Plaintiffs had agreed to drop their opposition to Berg's appeal then pending in front of BMZA, is evidence not of the parties' intention to consider the Plaintiffs as third party beneficiaries to the Agreement, but is instead of [*sic*]evidence of the Plaintiffs' satisfaction with the proposed resolution of this continuing conflict.  To be clear, [DHCD] and Berg were the actual parties to the appeal, and they alone had the ability to continue with the appellate process before BMZA or not."

In this appeal, Burnett/Ellicott has abandoned its claims of public and private nuisance and complains only about the court's ruling in its declaratory judgment action. It argues that it had the requisite legal interests for standing based on (1) its status as an intended third-party beneficiary of the October 15, 2013 Consent Agreement, and (2) its detrimental reliance on that Agreement.  We disagree and shall affirm the judgment of the Circuit Court.

THIRD-PARTY BENEFICIARY

It was in *Mackubin v. Curtiss-Wright Corp.*, 190 Md. 52 (1948) that the Court of Appeals first addressed whether a non-party to a contract should be allowed to enforce the contract on the premise that he (or she or it) was the intended beneficiary of the contract.  The Court noted that the common law initially did not allow such an extended benefit – the right to enforce a promise for which no consideration was given – but that

8

there had been a gradual relaxation of that rule and that courts had come to recognize the right of a third-party beneficiary to sue on a contract "made *expressly* for the benefit of either a donee beneficiary or creditor beneficiary." *Id.* at 56 (Emphasis added).

A person is a donee beneficiary, the Court said, "where it appears that the purpose of the promisee in obtaining the promise of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor asserted to be due from the promisee to the beneficiary." *Id.* at 56-57. A third person could be a creditor beneficiary "where no purpose to make a gift appears and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary. . . ."

Sixty-one years later, in *Lovell Land v. SHA*, 408 Md. 242 (2009), the Court brought the law governing third-party beneficiaries up to date, explaining in more detail the principles that govern whether and under what circumstances a non-party to a contract may be permitted to enforce the contract as a third-party beneficiary. The issue in *Lovell* was whether a former owner of a parcel of land was entitled to enforce a reverter clause in a deed between the State Highway Administration and Howard County to which the former owner was not a party, and the answer was "no."

The critical distinction, the Court concluded, was not between donee and creditor beneficiaries, but between "intended" and "incidental" beneficiaries. Confirming what the Court had held in *Mackubin*, the Court repeated that, in order to recover as an intended beneficiary, "it is essential that the beneficiary shall be the real promisee; *i.e.*, that the promise shall be made to him in fact, though not in form" and that "[i]t is not

9

enough that the contract may operate to his benefit. *It must clearly appear that the parties intend to recognize him as the primary party in interest and as privy to the promise."* (Emphasis in *Lovell*). The *Lovell Land* Court added that "[a]n incidental beneficiary acquires by virtue of the promise no right against the promisor or the promise." That language was repeated and confirmed more recently in *120 W. Fayette v. Baltimore*, 426 Md. 14, 36 (2012); *see also Yaffe v. Scarlett Place*, 205 Md. App. 429, 442-43 (2012).

In determining whether that standard is met, the court looks to "the intention of the parties to recognize a person or class as a primary party in interest as expressed in the language of the instrument and consideration of the surrounding circumstances as reflecting upon the parties' intention." *CR-RSC Tower v. RSC Tower*, 429 Md. 387, 458 (2012). The focus of the standard is on the intent of "the parties" to the Agreement – in this case DHDC and Berg – and that intent clearly must be to recognize Burnett/Ellicott as "the primary party in interest" – an interest at least equal if not paramount to that of DHCD and Berg.

Applying that standard, we look first to the language of the October 15 Agreement. The intent of the Agreement, as recited in the first paragraph, was to resolve outstanding violation notices and appeals therefrom. Burnett/Ellicott certainly had an interest in the disposition of those violation notices, but we would be hard-pressed to conclude that *its* interest in such a disposition was paramount to that of DHCD or Berg, who were the only persons directly affected by them. With respect to the pending appeals, in light of its oppositions and the fact that it was an adjoining property owner,

10

Burnett/Ellicott would be regarded as an interested party entitled to participate in a hearing and to seek judicial review if aggrieved by an adverse BMZA ruling, although it is of interest to note that, in the October 2013 Consent Agreement, it was not mentioned as a party to those appeals. As noted, the Consent Agreement defined the parties to the appeals as being only DHCD and Berg. Whether that omission was right or wrong, it does have a bearing on whether DHCD and Berg regarded Burnett/Ellicott as the primary party in interest with respect to the Consent Agreement.

Burnett/Ellicott is mentioned five times in the Consent Agreement. In ¶3, in connection with Berg's request for a variance for a fence 10 feet high and 550 feet long, the Agreement noted that such a variance would directly affect Burnett/Ellicott and that it had filed an opposition to the request. In ¶4, it noted, without comment, that Burnett/Ellicott had filed an opposition to Berg's appeal of Violation Notice 790403A-2 regarding the fencing at 1500 Bayard Street, and in ¶5, the Agreement recited, also without comment, that Burnett/Ellicott had filed an objection to Berg's appeal of the alleged use by Berg of the Bayard Street property without a proper occupancy permit.

In ¶6, the Agreement noted that, as a result of the Agreement, Burnett/Ellicott had agreed to withdraw its opposition to Berg's appeals. Finally, in ¶7, the Agreement stated that the terms of the Agreement did not limit "the legal, equitable, or administrative rights" of Burnett/Ellicott. Despite its argument to the contrary, none of those references suffice to show a clear intent to recognize Burnett/Ellicott as the "primary party in interest," sufficient to permit it to seek remedies and interpretations contrary to those desired by DHCD and Berg or to be able to block interpretations or remedies desired by

11

them.  In particular, the reference in ¶ 7 does not purport to recognize that Burnett/Ellicott had *any* enforceable legal, equitable, or administrative rights but only that the Agreement was not intended to affect any such rights that it may have.

Of particular relevance in that regard is something that Burnett/Ellicott had demanded that was *not* included in the Agreement.  As noted, Burnett/Ellicott was involved in the negotiations that ultimately led to the October agreement, and that really is the basis for its claim of third-party beneficiary status.  One of its "demands," listed on the agenda for a July 9, 2013 meeting between representatives of Burnett/Ellicott and Berg was that Berg post a $500,000 performance bond or place that amount in escrow "to Secure Burnett/STX/Ellicott Dredges and the City in the Timely Performance of the Item 1 and 3 Obligations, *With Burnett/STX/Ellicott Dredges Having the Full and Unfettered Right to Undertake or Complete the Performance If Berg Fails to Fully Perform By December 31, 2013*."[3]  (Emphasis added).  Had that provision been included in the Consent Agreement, Burnett/Ellicott's claim of third-party beneficiary status would have been far more substantial, but the fact is that it was not included, which indicates the converse intent that Burnett/Ellicott was not to have that status.

Apart from the text of the Consent Agreement is the public policy implication of recognizing a right of Burnett/Ellicott to enforce the terms of that Agreement.  As we

---

[3] Item 1 on the Agenda was "Use and Fence Violations Summarized in May 15 letter," which we assume was the letter of that date sent by DHCD to Berg outlining the nature of the violations alleged by that agency, including those related to the fencing.  Item 3 refers to a Burnett/Ellicott Position Statement of February 21, 2013, which set forth its position regarding what it regarded to be the unlawful use of the Berg properties.

12

have observed several times, the purpose of the Agreement was to resolve the building

and zoning violations alleged by DHCD.  The authority and duty to enforce the City

building and zoning laws are committed by statute to DHCD.  *See* Baltimore City Code,

Art. 3, §§ 2-3(a)(9) and (10) and 2-7 (u) and (v).[4]  The Code anticipates that DHCD

would exercise that authority directly and, except as may be provided by other law,

exclusively. [5]

The Court of Appeals has treated local zoning authority as an exercise of the

police power of the State (*Queen Anne's County v. Miles*, 246 Md. 355, 364 (1967)) and,

in light of that, has adopted "the familiar premise that a municipality may not contract

away the exercise of its zoning powers." *Attman v. Mayor*, 314 Md. 675, 685 (1989);

*Montgomery County v. Revere*, 341 Md. 366, 385 (1996).  That Court also has expressed

---

[4] Section 2-3(a)(9) authorizes DHCD to exercise the powers and to perform the duties conferred on the Zoning Commissioner.  Section 2-3(a)(10) authorizes DHCD to administer and enforce the City's Building, Fire, and Related Codes Article and all other City regulatory codes that relate to buildings, housing, or sanitation, except where such administration or enforcement is committed by the City Charter to another City agency.  Section 2-7(u) authorizes DHCD to enforce the City zoning laws, including the location and use of building, structures, and land for industrial or other purposes.  Section 2-7(v) vests in DHCD the power to issue permits for and exercise supervision and inspection over building construction and installation, the use of land and buildings, the alteration, relocation, repair, and reconstruction.

[5] Section 2-7(kk) of the City Code acknowledges that it may be appropriate for DHCD to contract with another person or persons for the continuing implementation of some or all of the functions and duties authorized by §2-7, but requires that any such contractual arrangements provide for submittal to and approval by the Mayor and City Council of the annual budget and operations of such persons, which, so far as the record in this case reveals, was never contemplated or done with respect to the October Consent Agreement.

its adherence "to the general rule that parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident." *Auction Reps. v. Ashton*, 354 Md. 333, 344 (1999).

These confirmed principles provide a dimension to the ultimate determination of the parties' intent that may not be present when the obligations sought to be enforced by a private person claiming to be a third-party beneficiary do not involve, much less intrude upon, the exercise of governmental authority. *See Beckett v. Air Line Pilots Ass'n.*, 995 F.2d 280, 288 (D.C. Cir. 1993); *Moore v. Gaither*, 767 A.2d 278 (D.C. 2001); and *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1065 (D.C. 2008) ("[T]hird party beneficiaries of a Government contract are generally assumed to be merely *incidental* beneficiaries and may not enforce the contract absent clear intent to the contrary"). *Cf. Astra USA, Inc. v. Santa Clara County, Cal.*, 563 U.S. 110 (2011).

Having withdrawn its objections to the pending appeals and thereby having become a complete stranger to the disputes between DHCD and Berg, Burnett/Ellicott seeks to assert a right under a Consent Agreement to which it was not a party to thwart the right of DHCD, in the exercise of its statutory authority to administer the City zoning and land use laws, to extend briefly the time for completion of a project that DHCD believed was reasonable under the circumstances and thereby terminate the right of Berg to continue using its property in a manner that DHCD found was permissible under the zoning laws it was authorized to enforce.

The question is whether DHCD and Berg intended for Burnett/Ellicott to have that authority. The Circuit Court, on extensive evidence (filling four cartons), concluded that the answer was "no," and, for the reasons noted above, we find no legal error or abuse of discretion in its making that finding.[6] In light of that conclusion, we need not consider whether, under the principles stated in *Restatement (Second) of Contracts*, §311 and *Spates v. Spates*, 267 Md. 72, 77 (1972), DHCD and Berg had the authority to modify the time deadline even if Burnett/Ellicott *were* a third-party beneficiary.

PROMISSORY ESTOPPEL

There was not a separate Count in the Second Amended Complaint based on promissory estoppel. Rather, in Count 2 – the Count for declaratory judgment – Burnett/Ellicott averred that "[f]urthermore, any attempt by Berg and the Department to amend or modify the deadline or cure provisions of the October 15 Agreement after May 24, 2014, without the agreement of Plaintiffs would be impermissible, invalid and void or voidable for lack of consideration and otherwise as well as under equitable principles of promissory estoppel and detrimental reliance." No factual allegations specific to that

---

[6] Although the only provision in the October Consent Agreement that Burnett/Ellicott seeks in this case to enforce is the May 23, 2014 time limitation on constructing the wall, recognition of its status as a third-party beneficiary would have given it the right to challenge the exercise of DHCD's discretion in interpreting, or agreeing to a minor modification of, other provisions as well, including a determination by DHCD that Berg was operating the structures on its property in compliance with the City zoning code or whether the wall was substantially complete at any particular time.

averment are to be found, a point made by Berg both in the Circuit Court and in this Court.

The doctrine of promissory estoppel or detrimental reliance is treated in the *Restatement (Second) of Contracts*, §90(1) as an example of a contract without consideration. It is captioned as "Promise Reasonably Inducing Action or Forbearance" and provides, in relevant part:

> "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." (Emphasis added).

In *Pavel v. A.S. Johnson*, 342 Md. 143, 166 (1996), the Court adopted that doctrine but recast the *Restatement* language as a four-part test:

> (1) A clear and definite promise;
>
> (2) Where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
>
> (3) Which does induce actual and reasonable action or forbearance by the promisee; and
>
> (4) Causes a detriment which can only be avoided by the enforcement of the promise.

Although the Court regarded its formulation as a mere recasting of the *Restatement* provision, there is one significant difference. The Court's version did not include "a third person" as one whose forbearance would allow it to enforce the promise; nor did this Court do so when quoting the *Pavel* language in *Citiroof v. Tech Contracting*, 159 Md. App. 578, 589 (2004); *MTA Lodge No. 34 v. MTA*, 195 Md. App.

16

124, 209 (2010); or *Bessette v. Weitz*, 148 Md. App. 215, 235 (2002). Had the *Pavel*

Court's omission been in a purported verbatim quotation of the *Restatement* language,

we might suspect that it was simply a typographical error, but as it declined, in its own

restatement of the rule as a tenet of Maryland law, to include detrimental reliance on a

promise by a third person, we are not at liberty to treat the omission so cavalierly.[7] Until

the Court of Appeals instructs us otherwise, we must assume that it meant what it said,

and not what it could have said but didn't say.[8] Accordingly, even if we were to regard

---

[7] The Restatement's allowance of third parties to enforce a promise made for their benefit, with one caveat, was deliberate. Comment c. to §90(1) states:

> "If a promise is made to one party for the benefit of another, it is often foreseeable that the beneficiary will rely on the promise. Enforcement of the promise in such cases of reliance rests on the same basis and depends on the same factors as in cases of reliance by the promise. Justifiable reliance by third persons who are not beneficiaries is less likely, but may sometimes reinforce the claim of the promise or beneficiary."

*See* also *Murray on Contracts* (5th ed.) §67[B][4] ("To permit a promisee to recover on the basis of detrimental reliance, but to preclude a recovery for a third party who is equally justified in relying on the promise, is unsound"). Nonetheless, as Murray acknowledges, not all courts hold that view. *See Lee v. Paragon Group Contractors*, 337 S.E.2d 132 (N.C. App. 1985) and *Bolden v. General Accident, Fire and Life Assurance Corp.*, 456 N.E.2d 306 (1983). In *Pennsy Supply, Inc. v. American Ash Recycling Corp.*, 895 A.2d 595 (2006), the Pennsylvania Superior Court noted the extension in *Restatement (Second)* §90(1) to third parties and observed that "[a]pplication of this section, while clearest in the case of an intended third party beneficiary, is not limited to such."

[8] We do note that, in *Oliveira v. Sugarman*, 451 Md. 208, 236 (2017), the Court cited *Pavel* as "adopting the elements for promissory estoppel from *Restatement (Second) of Contracts* §90(10) (1979) as Maryland law." The heart of the issue in that case was whether an executive compensation plan recommended by the Board of Directors of a corporation and approved by the stockholders in 2009 constituted a contract between the Board and the stockholders such that the contract could not be modified without further stockholder approval. The Court held that, because the stockholders had failed to allege any individual damages from their 2009 approval of the plan, that approval failed to

17

the sanction for failure to complete the wall within the time set forth in the October Consent Agreement as a promise, Burnett/Ellicott, at best an incidental beneficiary, has no standing to enforce it and therefore no right to a declaratory judgment that it had such a right.

We add, as a contingent alternative view, that even if Burnett/Ellicott *were* legitimately entitled to claim promissory estoppel based on forbearance – the withdrawal of its objections to Berg's appeals – it would not be entitled to a declaration that Berg's non-conforming use terminated on May 24, 2014. The concluding statement in §90(1) of the *Restatement* is that "[t]he remedy granted for breach [of the promise inducing forbearance] may be limited as justice requires." We would find no justice whatever in forfeiting Berg's lawful non-conforming use because the wall was not completed by May 23, 2014, (1) given the extreme economic detriment to Berg from such a result and no allegation, much less proof, of any harm or damage to Burnett/Ellicott from the two-month delay, and (2) where (A) construction of the wall was what Burnett/Ellicott principally wanted and received, (B) delays in construction were caused by unforeseen circumstances, and (C) DHCD had concluded that the extension to July was warranted as a matter of sound and fair zoning administration.

**JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.**

---

support a promissory estoppel claim. *Id*. at 240. The Court did not quote the language from *Pavel* or comment on the omission in that language of any reference to third parties.

18