***Cushman & Wakefield of Maryland, Inc., et al. v. DRV Greentec, LLC,* No. 42, September Term (2018)**

Petitioners, commercial real estate brokers, procured a tenant for the subject property. The lease was for five years with a renewal option for an additional five years. The lease required the owner to pay the brokers' commissions for the initial lease and for any renewal term. The property was mortgaged. The mortgage and accompanying assignment of lease contained a clause making clear that the mortgagee/assignee was not liable for the performance of any of the covenants or provisions of any lease.

Shortly after the lease took effect, the owner defaulted on the mortgage and the property was sold at foreclosure sale. The lender was the successful bidder and eventually sold the property to respondent subject to the lease. When the tenant later renewed the lease, petitioners demanded that respondent pay the commissions due on the renewal and, when respondent declined, sued respondent, claiming that petitioners had a right to recover from respondent as third-party beneficiaries and because respondent, as a successor to the former owner, had accepted all the covenants of the original lease. The Circuit Court entered judgment for respondent, and the Court of Special Appeals affirmed. Both held that the covenant to pay commissions was a personal one that did not run with the land and, as neither respondent nor its assignors ever signed the lease, respondent was not liable on that personal covenant.

The Court of Appeals AFFIRMED, holding that even if petitioners qualified as third-party beneficiaries, that only gave them the right to sue whomever was liable. Agreeing with the lower courts that the covenant was a personal one that did not run with the land, however, the Court held that (1) because respondent was not a party to the lease (2) its assignors also were not parties, and, (3) in the assignment of the lease the assignors had expressly rejected any obligations of the lease, respondent was not liable.

Circuit Court for Montgomery County
Case No. 419686V
Argued: January 7, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 42

September Term, 2018

---

CUSHMAN & WAKEFIELD OF MARYLAND, INC., ET AL.

v.

DRV GREENTEC, LLC

---

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Wilner, Alan M. (Senior Judge, Specially Assigned)

---

Opinion by Wilner, J.

---

Filed: March 4, 2019

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



2019-08-20 09:57-04:00

Suzanne C. Johnson, Clerk

Petitioners, Cushman & Wakefield of Maryland, Inc. (Cushman) and Sloan Street Advisors, Inc. (Sloan) sued DRV Greentec, LLC (DRV) in the Circuit Court for Montgomery County to collect real estate brokerage commissions allegedly due after the tenant of the property exercised its option to renew a lease that Cushman and Sloan had procured for a prior owner. Finding no liability on the part of DRV, the court granted summary judgment in its favor, and, in an unreported Opinion, the Court of Special Appeals affirmed that judgment. We granted *certiorari* to determine whether the two lower courts were correct. We shall conclude that those courts *were* correct and affirm the Court of Special Appeals' judgment.

## BACKGROUND

The property in question is located at 7700 Hubble Drive in Greenbelt, Maryland. It consists of two buildings, with an adjoining lobby, comprising 120,000 square feet. The property was purchased by MGP Greentec IV, LLC (MGP) in 2005 and mortgaged initially to Bear Stearns but, through assignments ultimately to Bank of America (BOA).[1] As part of the security for the loan, MGP assigned to the lender all current and future leases. The assignment clause in § 3.7 of the Deed of Trust provided that "[s]uch assignment to Lender shall not be construed to bind Lender to the performance of any of the covenants,

[1] The conveyance to MGP was in the form of a 70-year ground lease. The parties regarded the ground lease as the "property" and MGP as the "owner," and we shall do likewise.

conditions, or provisions contained in any such Lease or otherwise impose any obligation upon Lender."

Supplementing that clause in the Deed of Trust was a separate Assignment of Leases and Rents, § 4.1 of which confirmed that the Assignment "shall not be construed to bind Lender to the performance of any of the covenants, conditions or provisions contained in any Lease or Lease Guaranty or otherwise impose any obligation upon Lender."

In 2009, the then-current tenant vacated the property, and MGP began searching for a replacement. To that end, it entered into a contract with Cushman, a commercial leasing agent, to find a new tenant. The agreement obligated "Owner," identified in the Agreement as MGP, to pay a commission equal to three percent of the aggregate gross rental for the initial lease term and, if that term was renewed or extended, an additional commission equal to three percent of the aggregate gross rental for the renewal term.

Contemporaneously, the National Aeronautics and Space Administration (NASA) was looking for office space for its Joint Polar Satellite System and employed Sloan to assist it in that endeavor. NASA and Sloan decided to use a government contractor, TRAX International Corporation (TRAX), to act as the entity to lease and manage the space. Cushman and Sloan collaborated in their efforts, which led to a Deed of Lease for the Hubble Drive property being signed on July 15, 2010. MGP was the landlord and TRAX was the tenant. The lease term was to commence when the leasehold improvements were complete, which was anticipated to be October 1, 2010, and to run for "approximately" 66

months. Subject to certain conditions, § 32 of the Lease gave TRAX an option to renew for one additional five-year term.

Section 1.17 recognized Cushman as the Landlord's broker and Sloan as the Tenant's broker. Section 17 made the Landlord exclusively liable for brokers' commissions, with respect to both the initial lease and any renewal of it. In relevant part, it provided:

> "Landlord agrees to compensate the Real Estate Brokers referenced in Section 1.17 above in accordance with a separate agreement, and agrees to indemnify Tenant against any claims, damages, costs, expenses, attorneys' fees or liability for compensation or changes which may be incurred by Tenant as a result of any claim of non-payment made by Real Estate Brokers. In no event shall Tenant have any liability for Real Estate Broker commissions. In addition, in the event Tenant exercises its Option to Renew pursuant to Section 32 below, Landlord shall pay Tenant's Broker a fee of $617,928.50, and Landlord's Broker a fee of $463,446.37."

Section 19 gave the Landlord the right to transfer any portion of its interest in the project and to assign the Lease to the transferee. The section continued that, following such a transfer, "Tenant shall look solely to Landlord's transferee for the performance of Landlord's obligations" and that,"[s]ubject to the rights of any lender holding a mortgage or deed of trust encumbering all or part of the Project, Tenant shall look solely to Landlord's equity interest in the Project . . . for the collection of any judgment requiring payment of money by Landlord arising out of [ ] Landlord's failure to perform its obligations under this Lease . . ." Section 31.8 provided that the Lease was binding on the parties and their successors and permitted assigns. Section 23 of the Lease, however, stated that the Lease "shall be subordinate to any ground lease, mortgage, deed of trust, or any other hypothecation or security now or hereafter placed upon the Project."

Not long after the TRAX lease took effect, MGP defaulted on its mortgage, and, in January 2011, the property was sold at a foreclosure sale. BOA, the successor lender, was the successful bidder, took title to the property subject to the Lease, and employed Transwestern and C-III Realty Services, to market the property. An Offering Memorandum prepared by Transwestern noted that the tenant, TRAX, had a five-year renewal option and that "LL to pay TT Broker $617,928 and LL Broker $463,446."

In March 2012, BOA's assignee sold the property to DRV. As part of the sale, which the court ratified, the seller transferred its interest in the TRAX Lease. In that Assignment, DRV assumed and agreed to perform "all of the covenants, agreements and obligations under the Lease and Contracts *binding on Assignor or the Real Property, Improvements, or Personal Property* . . ." (Emphasis added). A similar commitment was made in an assignment of the Lease to DRV's lender – that DRV would "observe and perform when due all the obligations imposed upon the lessor under the Leases and not [] do or permit to be done anything to impair the security thereof."

In July 2015, TRAX renewed its Lease for an additional five years which, in September, produced a demand by Cushman and Sloan that DRV pay the commissions provided for in the Lease ($463,446.37 and $617,928.50, respectively). When DRV rejected their demand, this lawsuit ensued.

In the Circuit Court, cross motions for summary judgment were filed. Cushman and Sloan argued that DRV was liable because (1) the Lease covenant was one that ran with the land, (2) even if it did not, DRV had expressly assumed the duty to pay the

commissions, (3) the plaintiffs could recover as third-party beneficiaries, and (4) they could recover also under theories of successor liability and *quantum meruit* for unjust enrichment.

The court rejected all of those arguments. It concluded that the obligation to pay commissions was a personal one of MGP that did not "touch and concern" the land, and therefore did not run with the land. Relying on out-of-State cases, the court held that merely taking an assignment subject to the Lease did not constitute an assumption of that obligation under a privity of contract theory, and that, as neither DRV nor any of the lenders from whom it derived its interest ever signed the Lease, it was not liable under a third-party beneficiary theory. Successor liability was rejected because DRV never acquired the assets of MGP and therefore was not a "mere continuation or reincarnation" of MGP. Finally, the court concluded that the plaintiffs had failed to establish the requisite elements of *quantum meruit*. The Court of Special Appeals affirmed for largely the reasons given by the Circuit Court.

Undeterred, petitioners present to us some of the same arguments raised in the two lower courts. They contend that (1) the Court of Special Appeals erred in determining that, in order to be recognized as a third-party beneficiary, they must be a "primary party in interest," and (2) when a successor landlord expressly assumes a lease and represents that he/she/it is assuming "all" obligations of that lease with knowledge of the lease provisions benefitting intended third-party beneficiaries, the successor "is also assuming obligations of the original Landlord to the intended third-party beneficiaries."

<u>DISCUSSION</u>

As noted, the Circuit Court's rulings were in the form of a summary judgment, which is permissible where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 2-501(f). On the issue that we shall address, we perceive no genuine dispute of material fact in this case. The only relevant issues are ones of law, which we review *de novo*.

**<u>Third-Party Beneficiary</u>**

Petitioners spend eight pages of their brief and spent a fair portion of their oral argument supporting their position that they are third-party beneficiaries of the promise in the Lease that the "Owner" pay the brokerage commissions due upon a renewal of the Lease. Respondent really takes no issue with that (although it certainly does not concede it) but urges that, even if they have that status, it is irrelevant. Because we agree with respondent, we need not spend much time explaining yet again the purpose and contours of the third-party beneficiary doctrine, other than to confirm what we said in *Lovell Land v. SHA*, 408 Md. 242 (2009); *Dickerson v. Longoria*, 414 Md. 419 (2010); and *120 W. Fayette v. Baltimore*, 426 Md. 14 (2012), namely that a person is a third-party beneficiary only where the promise sought to be enforced was intended for that person's benefit and the parties intended to recognize that person as the primary party in interest with respect to that promise. *See* also *Wm. T. Burnett Holdings v. Berg Bros.*, 235 Md. App. 204 (2017).

It is fairly arguable that petitioners *were* intended beneficiaries of § 17 of the 2010 Lease. They were the only persons named as the brokers, and the amount of commissions

that would be due to each of them on renewal were specified in the Lease. It is clear that they were not the *only* intended beneficiaries of that provision, however. That provision also was intended to benefit TRAX – the tenant – by placing the obligation to pay the commissions solely on the landlord and exempting the tenant from any liability for those commissions.

If we needed to do it, we would have to resolve whether third-party beneficiary status requires that the third party be *the* primary beneficiary – ahead of everyone else – or only *a* primary beneficiary. Comment a. to § 302 of the *Restatement (Second) of Contracts* suggests the latter ("Section 2 defines 'promisee' as the person to whom a promise is addressed, and 'beneficiary' as a person other than the promisee who will be benefitted by performance of the promise. *Both terms are neutral with respect to rights and duties; either or both or neither may have a legal right to performance*") (Emphasis added).[2] Given the basis for our ultimate decision, however, we need not resolve that issue but shall assume, solely for purposes of this case, that petitioners would qualify as third-party beneficiaries of §17 and therefore would have the right to sue anyone who may be liable for paying the commissions.

---

[2] The text of § 302 is consistent with that statement. It articulates the principle as follows:

> "(1) Unless otherwise agreed between promisor and promisee, a beneficiary is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

## <u>**Liability of DRV**</u>

The critical issue here is not Cushman/Stone's status but that of DRV. Relying principally on a New York trial judge's decision in *Spivak v. Madison-54th Realty Co.* 303 N.Y.S.2d 128 (Sup. Ct. Kings County, 1969), Cushman/Stone insist that, notwithstanding that neither DRV, nor BOA, nor BOA's assignors (or assignees) signed the Lease containing the covenant to pay the brokerage commissions or expressly acknowledged or agreed to be bound by that covenant, they are nonetheless liable because they assumed the Lease with *all* of its obligations.

Reliance on the *Spivak* decision is curious because the judge in that case held exactly the opposite – that in the absence of a covenant that runs with the land, mere acceptance by a successor in title of a lease containing an agreement to pay commissions on a renewal does not bind the successor to pay those commissions. The correctness of that decision was confirmed by the Appellate Division of the New York Supreme Court in *Gurny, Becker & Bourne, Inc. v. Bradley*, 476 N.Y.S.2d 677 (A.D. 1984) and, indeed, is the general rule among the courts that have considered the issue. *See Coggins v. Joseph*, 504 So.2d 211 (Miss. 1987); *Blasser v. Cass*, 314 S.W. 2d. 807 (Tex. 1958); *Talcott v. Warren*, 171 S.E.2d 907 (Ga. App. 1969); *Keys v. Frazier*, 213 So. 2d 276 (Fla. App. 1968); and *Cushman and Wakefield v. Progress Corporation*, 568 N.Y.S.2d 56 (A.D. 1991).

The point made in all of those cases, regarded as well-settled, is that an agreement to pay brokerage commissions on a renewal of a lease is a personal covenant that does not run with the land, "that the mere assignment of a contract does not carry with it any

obligation by the assignee to assume the assignor's obligation thereunder" [and] ["i]n the absence of an agreement by the assignee to assume the assignor's obligation, the assignee has no contractual obligation to perform." *Coggins, supra,* at 213. That is the case even when the assignee takes the property "subject to the lease." *Keys, supra*, at 277.

The Texas Court, in *Blasser*, explained the rationale for that rule. Personal covenants of this type, it said, "being purely for the benefit of one having no interest in the land, will not be enforced against successive owners of real property as a covenant running with the land" because "[t]o burden lands with personal covenants would be to hamper and impede real estate transactions to the detriment of owners, purchasers and agents." *Blasser* at 809.[3]

Against this consensus view, Cushman/Sloan argue that DRV *did* expressly assume the obligation to pay their commissions by agreeing in the assignment of the lease to perform "all of the covenants, agreements, and obligations under the Lease." That is not what the assignment said. It said that DRV agreed to assume the covenants, agreements, and obligations "*binding on the assignor*." (Emphasis added). Apart from the fact that DRV never signed the lease, neither did BOA, the assignor from whom DRV obtained its title, nor any of BOA's predecessor lenders. Indeed, as we pointed out, both the Deed of Trust and the Assignment that BOA acquired stated clearly that the Assignment "shall *not* be construed to bind Lender to the performance of any of the covenants, conditions or

---

[3] *See* also *Italian Fisherman v. Middlemas*, 313 Md. 156, 163 (1988), holding that where the *lessee* assigns its leasehold interest, the assignee becomes bound by "covenants *running with the land*." (Emphasis added).

provisions contained in any such Lease or otherwise impose any obligation upon Lender." (Emphasis added). There not only was no clear assumption of the brokerage fee obligation by BOA or its predecessor lenders but instead an express negation of such an assumption.

**JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.**